## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>  as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>  as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY | PROMESA<br>Title III<br><br><br>Case No. 17 BK 4780-LTS<br><br>(Jointly Administered) |
| FOREMAN ELECTRIC, INC.<br><br>      v.<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY, COBRA ACQUISITIONS LLC, CENTRAL OFFICE FOR RECOVERY, RECONSTRUCTION AHSHA TRIBBLE and KEITH ELLISON | ADV. PROC. NO.: |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the lastfour (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal TaxID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567- LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## ADVERSARY COMPLAINT

TO THE HONORABLE COURT:

Comes now Plaintiff, Plaintiff Foreman Electric Services Inc. ("Foreman" or "Plaintiff"), by and through its attorneys, for its Adversary Complaint against Defendants, Puerto Rico Electric Power Authority (hereinafter "PREPA" or the "Debtor"), Cobra Acquisitions LLC (hereinafter "Cobra"), Central Office for Recovery, Reconstruction and Resilience (hereinafter "COR3"), Ahsha Tribble (hereinafter "Tribble") and Keith Ellison ("hereinafter "Ellison") and alleges, states, prays, and requests relief as follows:

### INTRODUCTION

1.      This is an adversary proceeding arising from Defendants' calculated, intentional and fraudulent scheme to enrich themselves by steering contracts to a single contractor – Cobra – in exchange for financial, personal and professional gain, which remains ongoing, all at the expense of the people of Puerto Rico.

2.      As set forth in detail herein, PREPA, Cobra, COR3 and various government and private officials such as Tribble and Ellison (hereinafter "Ellison"), conspired to award appallingly high disaster relief contracts to only one vendor, based solely on a preferential payment scheme to defraud Plaintiff as well all American taxpayers.

3.      Although Plaintiff, who not only submitted the lowest bid, was already mobilized and doing commendatory restoration work in Puerto Rico.  Defendants consistently acted in furtherance of their scheme to prevent work from being given to Plaintiff, all the while leading Plaintiff to believe that (a) no such events were taking place – only mere clerical issues (which turned out to be patently false), (b) that any work and subsequent payments to Cobra would not

occur unless done properly (which turned out to be patently false) and (c) engaging in numerous acts in furtherance of and in attempt to conceal their scheme.

## THE PARTIES

4.     Plaintiff Foreman Electric, founded in 1949, is an electrical contractor. Foreman Electric has three strategic locations in San Juan, Puerto Rico, Odessa, Texas, and Austin, Texas. The company provides a large multitude of logistical and electrical services to the construction industry, oil and gas industry, and utility industry.  Foreman is a licensed contractor, authorized to operate in Puerto Rico.  Foreman was awarded a contract under Request for Proposal RFP-77844 on or about August 14, 2019 (hereinafter the "Foreman MSA").  Exhibit "1."

5.     Defendant PREPA is an electric power company owned by the Commonwealth of Puerto Rico responsible for electricity generation, power distribution, and power transmission.

6.     Defendant COBRA is a limited liability company duly organized under the laws of Oklahoma.

7.     Defendant COR3 assists with managing funds provided for public works projects, disaster relief and other instances where grant monies are received, including both FEMA and non-FEMA funds.

8.     Defendant Ahsha Tribble was the FEMA administrator assigned to and overseeing Puerto Rico's disaster restoration efforts.

9.     Defendant Keith Ellison was the President of Cobra.

## JURISDICTION AND VENUE

10.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under PROMESA and the U.S. Constitution.

11.     In addition, this Court has jurisdiction under Section 106(a) of PROMESA, which grants jurisdiction to this Court over "any action against the Oversight Board, and any action otherwise arising out of [PROMESA], in whole or in part."  48 U.S.C. § 2126(a).

12.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and Section 310 of PROMESA, which provides "The Federal Rules of Bankruptcy Procedure shall apply to a case under [Title III of PROMESA] and to all civil proceedings arising in or related to cases under [Title III of PROMESA]." 48 U.S.C. § 2170; Fed. R. Bankr. P. 7001.

13.     To the extent any of the issues or claims raised herein lie beyond the Court's original jurisdiction, the Court has supplemental jurisdiction under 28 U.S.C. § 1367 because such issues or claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution

14.     Venue is proper in this District under Section 307 of PROMESA.

## FACTUAL BACKGROUND

### *Hurricane Maria Strikes Puerto Rico, FEMA Becomes Involved*

15.     On September 20, 2017, Hurricane Maria, a Category 4 hurricane, made landfall in Puerto Rico which left the vast majority of Puerto Rico's residents without power.

16.     At or about the same time, PREPA triggered an emergency protocol to rebuild Puerto Rico's electrical grid.

17.     On September 20, 2017, declaration FEMA-4339-DR was issued, which authorized FEMA to issue public assistance grants to be used in recovery efforts.

18.     On or around October 11, 2017, FEMA awarded the first of several such public assistance grants to PREPA, as its third-party administrator in Puerto Rico, for emergency work

related to Maria.  The total amount of granted funds would be more than $1.9 billion.  These funds were in turn to be provided to contractors following a competitive bid process as required by federal and commonwealth law and regulations.

19.     Following major back-to-back hurricanes (Irma, a category 4, and Maria, a category 5) in September 2017, FEMA allocated grant funds to PREPA, the municipal entity in charge of electricity across the island, to hire private contractors and begin the arduous task of restoring Puerto Rico's power.

20.     PREPA was to properly oversee and assign work to contractors while FEMA would reimburse PREPA's costs related to approved and completed work.

21.     Until she was placed on leave in mid-May 2019, Tribble was the FEMA administrator assigned to and overseeing Puerto Rico's disaster restoration efforts. She was responsible for approving FEMA payments to PREPA in the form of reimbursements or otherwise.

22.     In his sworn stipulation of facts attendant to his plea allocution, Ellison admitted to illegally providing Tribble with luxury hotel accommodations, first-class flights, personal security services, and the use of an apartment.  In exchange, Tribble in her status as a FEMA administrator would advance Cobra's interests in connection with PREPA contract work (all at the expense of the other awardees).

23.     If not for Tribble's and Ellison's efforts to divert all work orders issued under RFP 77844 to Cobra, Foreman was prepared to successfully perform all contract work assigned to it. Instead, Ellison's and Tribble's efforts led to hundreds of millions of dollars in waste due to mobilization and demobilization costs, and Foreman failed to receive any of the $200 million in FEMA funds allocated to it in the Award.

24.     Mammoth and Cobra are both headquartered in Oklahoma and maintain a shared office and principal place of business in Oklahoma City.  Mammoth's directly and wholly-owned subsidiary, Mammoth Energy Partners, LLC ("MEP"), holds the equity interests in Mammoth's fifty-three indirect subsidiaries (collectively, the "Subsidiaries"), including Cobra.

25.     Mark Layton ("Layton") is and at all relevant times was Mammoth's CFO, secretary, and compliance officer while also serving as Cobra's and MEP's CFO.  Arthur Straehla ("Straehla") is and at all relevant times was Mammoth's CEO and director as well as the CEO of Cobra and MEP.   Layton's Declaration is attached hereto as Exhibit "2".

26.     Mammoth's and the Subsidiaries' cash is channeled to MEP on a daily basis as part of the group's treasury management system managed by another Subsidiary, Mammoth Energy, Inc. (hereinafter "MEI").

27.     Wexford Capital LP (hereinafter "Wexford") is and at all relevant times was Mammoth's majority equity shareholder. Wexford also provides space to Mammoth and Cobra. Two Mammoth directors, including the chairman of its board, also serve on Wexford's board of directors.

28.     Mammoth pays Wexford an annual fee of $500,000 or more in exchange for Wexford's "general financial and strategic advice" pursuant to an illusory services agreement executed in October 2016 which on information and belief remains in full force (the "Wexford Management Agreement").

29.     Wexford is a major transferee of Mammoth's and Cobra's ill-gotten gains. By way of example, on June 6, 2018—three days after Tribble informed Ellison that $200 million of PREPA payments to Cobra would be delayed and prior to such information being made public, Mammoth filed a registration statement with the SEC seeking to enable Wexford to sell up to four

million shares of its Mammoth common stock.  Wexford's directors, received approximately $17.5 million in payouts.

30.     Moreover, and as concerns Wexford's continued interest in obtaining as much of the Cobra funds it can obtain, PREPA has expressly disputed Cobra's entitlement to $291.7 million of the $436.4 million that it claimed to be owed. Yet, an additional $37 million of the so-called receivables were not even part of Cobra's claim in the PREPA bankruptcy action when reported on Mammoth's balance sheet.  An additional $10.3 million appears to represent costs that are not even reimbursable by FEMA, which as explained further herein, should have been reported to this Court.

31.     On August 10, 2023, Mammoth entered into a preliminary loan and security agreement with Wexford as lenders' agent, and on October 16, 2023, the final binding version was executed (the "Wexford Loan Agreement").  The Wexford Loan Agreement provides Mammoth a $45 million term loan.  Cobra guaranteed Mammoth's payment and performance under the Wexford Loan Agreement "jointly and severally, unconditionally and irrevocably, and as primary obligor and not only a surety."  The Wexford Loan Agreement also obligates Cobra to remit to Wexford 50% of all amounts that Cobra receives under the PREPA contracts as a mandatory prepayment.

32.     Incredibly, and absolutely self-serving to Cobra's executives (who will profit massively once more), 25% of all proceeds that Cobra receives from PREPA will be used to repurchase its own stock as part of the Stock Buyback.

33.     Tellingly, Cobra is prohibited from entering into any agreement for any sale, assignment, lease, conveyance, or transfer of property to it from another entity – meaning that any

funds provided to Cobra can automatically be impaired, and as set forth *inter alia*, would constitute a massively inequitable result for all parties in interest, including Foreman.

### *Foreman's Contracts With the U.S. Army Corps of Engineers*

34.     During October 2017, Foreman Electric began its deployment to Puerto Rico as a subcontractor for various U.S. Army Corps of Engineers ("USACE") projects.

35.     Foreman delivered at every turn: it employed over 400 linemen (who utilized over 220 bucket trucks and digger trucks to repair Puerto Rico's power lines) and expended over 250,000 man-hours in performance of several projects under three separate contracts from October 2017 through February 2018. Foreman Electric also operated as a subcontractor to MasTec Renewables Puerto Rico, LLC, Haliron Power LLC, and Bird Electric, Inc.

36.     To be sure that Foreman was indeed successful, in a letter of commendation dated February 28, 2018, USACE Project Engineer Ernesto Elias praised Foreman Electric's performance – including its "exceptional customer service" and "first-rate experience in one of the most dangerous fields of construction, high power." Elias also stated that USACE and its contractors "led the entire island on repairs and restoring power" and achieved 12,000 connections by the end of November 2017.

### *PREPA Publishes RFP-77844 - Electrical Grid Disaster Relief Work*

37.     On February 16, 2018, PREPA published Request for Proposals ("RFP") 77844 seeking electric system restoration services and "immediate restoration of the PREPA system due to the impact of Hurricane María." The corresponding contract would be for a term of one year.

38.     According to PREPA Governing Board Resolution 4614, RFP-77844 was intended to "***make new contracts for all future work, emergency and permanent, instead of relying on the emergency Cobra Contract of October 2017***." (emphasis added).

39.     PREPA made several material statements to Plaintiff contending that it was following all resolutions, including Governing Board Resolution 4614.

40.     RFP-77844 was to be competitively bid and required proposals to be received by March 2, 2018. Minimum qualifications for technical acceptability included (1) "at least one related scope project within the past three years on transmission lines, distribution lines, all in urban and mountainous terrain with difficult to zero access, and references;" (2) "at least two positive references for a prior/current engagement of a contract size of at least $40 million in a single contract;" (3) "a preliminary schedule of mobilization logistics and list of resources (manpower and equipment);" and (4) a "list of fully loaded time and equipment prices."

41.     The grading criteria for RFP-77844 was weighted 65% for quantitative factors (including pricing and capacity for work) and 35% for qualitative factors (including responder background, financial statements, reputation, project management plan, and administration).

42.     For purposes of the RFP 77844, *work* includes the following: "all actions, products, documentation, electronic programs, reports, testing, administration, management, services, materials, tools, equipment, and responsibilities to be furnished or performed by the Company under the Contract, **together with all other additional necessities that are not specifically recited in the Contract, but can be reasonably inferred to complete all obligations and fully satisfy the intent of the Contract.**" (emphasis added).

43.     The RFP 77844 specified that the contractor "shall" provide certain "required resources," including, but not limited to the following:

    a.   100 Transmission Linemen

    b.   200 Distribution Linemen

    c.   20 Civil workers, Damage assessors, heavy equipment operators, 20 logistics, safety and others (with a minimum of sixty percent of the workforce being sourced from the contractor's own workforce)

    d.   Transmission Digger Trucks

    e.   Distribution Digger Trucks

    f.   Auger Trucks

    g.   Distribution Bucket Trucks

    h.   Transmission Bucket Trucks

    i.   Pick ups

    j.   Dozer, semi tractors

    k.   60 and 30 Ton Cranes

    l.   Semi Tractors and haul. <u>See</u> RFP, Appendix A – Technical Specifications, at 1.1 "Scope of Phase 2 and Phase 3 Restoration."

44.    The RFP 77844 unequivocally stated that "[t]hese resources *shall* be in addition to any available personnel or equipment on grounds," and that "[r]esources *must* be available to start working at the beginning of Phase 2: March 5, 2018." The contractor was then required to include in its proposal a "logistic plan for mobilization" along with an "estimated cost for mobilization." <u>Id</u>. The RFP further stated that "PREPA intends to pay Standby Pay as soon as the contractor is notified that their assistance is required for a specific storm." Appendix A at 1. "Scope."

45.    Finally, and in the pertinent part, the RFP 77844 further stipulated that any awarded contract "*shall* consist of PREPA's Contract together with the RFP Documents, including, but not

limited to, the executed Proposal Documents, which shall be collectively referred to as the Contract

Documents." (hereinafter "Contract Documents").[2] The RFP is attached hereto as Exhibit "1" –

Scope of Services, at § 2.3.1.

### *Cobra's Contract Awards from PREPA*

46.     Cobra was formed on or around January 31, 2017 by Mammoth.  At the time,

Mammoth's business consisted primarily of oil and gas operations, rather than electrical utility

infrastructure.

47.     On October 19, 2017, PREPA executed a contract with Cobra identified as

"Emergency Master Services Agreement for PREPA's Electrical Grid Repairs—Hurricane Maria"

(the "First Cobra Contract").

48.     The First Cobra Contract had a one-year term and a value not to exceed $200

million, with a $15 million deposit due upon execution. FEMA financial assistance would be used

to fund the project.

49.     On December 23, 2017, FEMA informed the Government of Puerto Rico that, via

Tribble,  it had determined the costs under the First Cobra Contract to be reasonable.  As of that

date, Cobra already had billed some $174 million in costs to PREPA.

50.     On or around December 29, 2017, FEMA officially approved the First Cobra

Contract and its corresponding PW, designated PW-251, finding costs incurred up to $200 million

under the contract to be reasonable.

51.     Notably, on July 3, 2019, the Department of Homeland Security Office of

Inspector General would issue a memorandum, entitled "FEMA's Cost Eligibility Determination

of Puerto Rico Electric Power Authority's Contract with Cobra Acquisitions LLC," finding that

---

[2] The terms *Contract* and/or *Contract Documents* will be used indistinctively throughout the Complaint.

FEMA's cost eligibility determination with respect to the First Cobra Contract and PW-251 was unsound and unsupported.

52.     Following the first several Amendments to the First Cobra Contract, PREPA and Cobra executed a Fourth Amendment on January 28, 2018, retroactively made effective to January 1, 2018, that increased the maximum contract value to $445,429,80, over double the value of the original contract and the estimated cost of PW-251.

53.     On February 27, 2018, PREPA and Cobra executed a Fifth Amendment, increasing the maximum contract value to $945,429,800, again more than doubling the contract's value since the previous amendment.

54.     FEMA subsequently amended PW-251 to approve the $945,429,800 in public assistance funds for the First Cobra Contract, which was now nearly five times the value of the original contract and cost estimate.

55.     As of October 2018, FEMA had reimbursed PREPA more than $800 million for Cobra contract costs.

56.     Yet, and in violation of PREPA's Governing Board Resolution 4614, PREPA did not initially use the newly awarded contracts to perform all future work "instead of relying on the emergency Cobra Contract of October 2017," and instead kept assigning work under that First Cobra Contract until its maximum value of $945 million was met before beginning to assign all remaining work under the Second Cobra Contract.  Attached hereto as Exhibit "3".

*Foreman's Contract Award from PREPA*

57.     Foreman Electric timely responded to RFP-77844 with a technically acceptable proposal on or before March 2, 2018.

58.     On March 29, 2018, PREPA awarded Foreman Electric one of the three contracts under RFP-77844 (the "Foreman Electric Contract"), with MasTec and Cobra as the other two awardees.

59.     Unlike the contracts awarded to the other two awardees which encompassed the performance only of emergency work, *the Foreman Electric Contract included the performance of permanent work in addition to emergency work*.

60.     As required by the RFP, Foreman Electric fully mobilized within two weeks of its contract award, that is, on or before April 12, 2018.

61.     On April 11, 2018, PREPA invited Foreman Electric to negotiate final contract terms at PREPA headquarters in San Juan, Puerto Rico.

62.     On April 13, 2018, Foreman Electric attended the negotiation of final contract terms. Foreman Electric's representatives included Bird, its CEO, J.T. Trainer, its CFO, and Luis Talavera, a local consultant (hereinafter "Talavera").

63.     Prior to submitting its proposal, Foreman sought clarification on the mobilization costs through questions/answers that were appended to RFP in "Addendum I" dated February 24, 2018. Foreman inquired into the start date of March 5, 2018, since it was before the project award date of March 12, 2018. PREPA responded that the "dates were shifted" to "include next storm season," and that the "start date will be two weeks after contract is awarded." Addendum I at p. 3. In a subsequent question on the same topic, PREPA specified that contractor "crews *shall be mobilized* and *ready to start* works [sic] two weeks after contract is awarded." Id. at p. 5 (Emphasis added). As for any reimbursable costs, PREPA stated that it will reimburse for "[c]harges, at rates internally used by Contractor, for the use of transportation equipment and *other equipment requested*."

64.     Foreman submitted a 63-page proposal, in which it specified that it would provide over 550 linemen and support personnel and over 350 pieces of necessary equipment. Proposal, Appendix C, at § 1.2. "Project Overview". In Section 5.3, "Account Management," Foreman provided a detailed mobilization and demobilization plan, which included PREPA paying for both.

65.     While the Foreman Electric representatives were on PREPA's premises, several PREPA board members approached Talavera and inquired whether Foreman Electric would be willing to pay them in the amount of $200,000, implying that such a bribe would move contract actions along. The request was refused.

66.     On May 26, 2018, and May 29, 2018, respectively, Cobra and MasTec each executed one-year Master Service Contracts with PREPA (the "Second Cobra Contract" and the "MasTec Contract," respectively).

67.     On or around these same dates of contract execution, a PW was approved by FEMA for the a second Cobra Contract, designated PW-466.

68.     While FOMB approved the Foreman Electric Contract for a value of up to $250 million pursuant to PROMESA, however, for reasons unknown to Plaintiff at the time, a PW was not approved by FEMA for the Foreman Electric Contract contemporaneously with the PWs approved by FEMA for the Second Cobra Contract and the MasTec Contract.  Plaintiff would come to learn that the PW for Foreman was intentionally not provided to FEMA at that time, in order to favor Cobra.

69.     The execution of the Foreman Electric Contract and the approval of said contract's PW would be delayed until January 29, 2019.

70.     As explained in the next section, Plaintiff would later learn that, due to the actions of Debtor, Cobra, Tribble, Ellison and others, that not only was the execution of its intentionally

stalled by PREPA, Tribble, and Patterson, in cooperation with Ellison and other officials from Cobra and Mammoth, as part of their corrupt scheme to obtain all disaster relief work for Puerto Rico's electrical grid, but that PREPA would further intentionally allow, and petition this Court to approve a new, illegally-obtained massive windfall payment to Cobra of more than $180,000,000. DE 5303.

## THE BANKRUPCTY CASE

71.     On May 3, 2017, the Financial Oversight and Management Board for Puerto Rico ("FOMB") filed a voluntary petition on behalf of the Commonwealth of Puerto Rico pursuant to section 304(a) of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA").

72.     On July 2, 2017, PREPA filed its Petition for Bankruptcy relief under Title III to restructure its debt in the Bankruptcy Court for the United States District Court for the District of Puerto Rico on or about July 2, 2017 (the "PREPA Bankruptcy").

*Cobra Claims Administrative Expense Claims Against Allegedly Owed to It by PREPA*

73.     Cobra filed a Motion For Allowance and Payment Of Administrative Expense Claims (the "Cobra Motion for Allowance") in the PREPA Bankruptcy on or about September 30, 2019.

74.     The Cobra Motion for Allowance made a claim against PREPA for $216,116, 471.93 for unpaid amounts under its First Contract and Second Contract with PREPA.

75.     The Bankruptcy Court entered an Order on October 17, 2019, staying all administrative claims, including the Cobra Motion for Allowance.

76.     PREPA, several times, asserted to this Honorable Court, and to all other parties in interest, that it would not pay Cobra.

77.    On February 25, 2020, PREPA filed its response to Cobra's Motion for Allowance, which included extensive arguments as to why PREPA should not have to agree to Cobra's demand for payment.  DE 1918.

78.    But Cobra, ever driven to squeeze more from its long-running graft, tried to make another end-run: on January 20, 2023, Cobra, in an attempt to make an end-run around PREPA and the scandal that was beginning to come to light, submitted a certified claim to FEMA seeking the remaining costs due to it, plus interest.

79.    On February 2, 2023, FEMA responded to Cobra's claim declining to issue a final decision on the basis that no contract existed between FEMA and Cobra.

80.    On September 21, 2023, an order was entered by the United States Board of Contract Appeals dismissed Cobra's claims for failure to state a claim.

81.    Cobra's submission of each and every invoice to PREPA, along with its representations in this Court and others, as set forth herein, are all continuous, ongoing actions in furtherance of the fraud and conspiracy.

### *Plaintiff Learns that PREPA and COBRA Attempt to Engineer a Release and Settlement Agreement*

82.    Despite PREPA's representations, and Cobra receiving more than one billion dollars from PREPA to date, based on the ongoing fraud and collusion with PREPA, on July 1, 2024, a Notice of Settlement was filed with this Court.  DE 5303.

83.    On September 3, 2024, Plaintiff filed its OBJECTION TO THE PUERTO RICO ELECTRIC POWER AUTHORITY'S 9019 MOTION FOR ORDER APPROVING SETTLEMENT WITH COBRA ACQUISITIONS LLC, DE 5335, which is incorporated herein by reference.

84.     The proposed Settlement, as put before this Honorable Court, states that Cobra shall have an allowed administrative expense claim of $**170,000,000 in addition to $18,371,028.79 in withheld FEMA funds** (emphasis added).  Importantly, this proposed Settlement "fully and finally resolves the Administrative Claim Motion **and all disputes related thereto**." (emphasis added).  As a result, the proposed Settlement would be an adjudication of the claims of Plaintiff, as well as others.

*Plaintiff's Becomes Aware of Further New Information*

85.     In September of 2024, Plaintiff learned from a former PREPA Board member, that FEMA was never provided with key documents that were absolutely necessary for Plaintiff to commence work.

86.     Prior to that, on December 14, 2022, Plaintiff was provided with a declaration of Mark Merritt, which Cobra attempts to use support its conduct. Attached hereto as Exhibit "4". The Merritt declaration is riddled with inconsistencies and on information and belief, was an attempt to further obfuscate, if not outright deny, the illegal conduct that transpired as part of the scheme to filter all work (including work under RFP-77844), to Cobra.

87.     As it turns out, from the award date of RFP- 77844, Cobra and others, with the assistance of Tribble in her position at FEMA, not only influenced PREPA to steer all electrical grid repair work to Cobra, (despite the other two awardees being fully mobilized and ready for work) but also continued to act in concert to allow PREPA to make another illicit payment to Cobra, this time in the form of the proposed settlement agreement.  DE 5303.

88.     Again, and contrary to its own Governing Board Resolution 4614, attached hereto as Exhibit "5".  PREPA kept assigning work under that First Cobra Contract, attached hereto as

Exhibit "6") until its maximum value of $945 million was met before beginning to assign all remaining work under the Second Cobra Contract.

89.     Directly due to Tribble and Patterson's intervention, no work or projects were ever assigned to Foreman Electric or MasTec under their RFP-77844 contracts.

90.     Given the delay in the execution of its contract and the issuance of its PW, Foreman Electric often contacted PREPA in an ongoing effort to move things along but was never provided with any answers as to why its contract was not proceeding.

91.     On Saturday evening, July 7, 2018, Foreman Electric representatives attended a public meeting of several high-level officials from different agencies such as PREPA and FEMA with individuals including but not limited to Tribble, Mark Merritt (for COR3), Jan Maduro (Deputy Director of Puerto Rico Energy Affairs Administration), and Carlos Mercarder (Washington D.C. representative for former Gov. Rossello).

92.     Crucial here is that when Plaintiff asked Tribble why FEMA was preventing the Foreman Electric Contract and PWs from moving forward, Plaintiff was never provided a substantive answer, let alone a truthful one.  Specifically, when Plaintiff asked why it appeared that Plaintiff was not receiving any work under RFP-77844, in response, representatives from COR3, PREPA, Cobra, MasTec met with Foreman Electric on July 8, 2018 where Tribble denied all responsibility for decisions with respect to Plaintiff and that PREPA was somehow submitting Project Worksheets incorrectly for all contractors other than Cobra due to confusion in the PW creation and submission process.  Both statements later turned out to be materially false and misleading.

93.     On information and belief, PREPA was present, joined in these statements and never corrected them.  Plaintiff, in the belief that several government agencies had come to answer

18

its questions truthfully, was led to believe that this was the official justification for the resulting

non-issuance of any work to Plaintiff.

94.     Worse yet, FEMA knew of, accepted and approved PREPA's PW submissions for

Cobra, indicating that PREPA either (a) knew full well how to create and submit a PW, or (b) that

FEMA, in concert with Tribble, Cobra and others, was willing to overlook errors in order to favor

Cobra, or at the vary least, avoid conflict with FEMA by virtue of Tribble.

### *Investigations Begin, But the Scheme is Yet to Be Revealed*

On September 3, 2019, Tribble, Ellison, and Patterson were indicted by a  federal

grand jury in the United States District Court for the District of Puerto Rico. *U.S. v. Tribble, et al.*,

No. 19-cr-00541, Dkt #3, (D.P.R. Sept. 3, 2019) (the "Indictment"). The Indictment  comprised

fifteen counts including Conspiracy to Commit Bribery, Honest Services Wire Fraud, Disaster

Fraud, violation of the Travel Act, False Statements, Acts Affecting Personal Financial Conflicts

of Interest, and Wire Fraud, attached hereto as Exhibit "7".

95.     The Indictment alleges a conspiratorial scheme by which Ellison offered Tribble

bribes in exchange for Tribble using the authority, power, and influence of her various official

positions at FEMA to ensure that all electrical grid repair work would be directed to Cobra and to

otherwise provide Cobra with favorable treatment, information, and opportunity advantages over

competing contractors, including Foreman Electric; few summaries cut as clear as U.S. Attorney

Rosa Emilia Rodríguez's apt assessment:

> **These defendants were supposed to come to Puerto Rico to help during the**
> **recovery after the devastation suffered from Hurricane Maria … [i]nstead,**
> **they decided to take advantage of the precarious conditions of our electric**
> **power grid and engaged in a bribery and honest services wire fraud scheme in**
> **order to enrich themselves illegally.**

(emphasis added).

96.     Pursuant to the Indictment and in furtherance of the conspiracy, Ellison's bribes to Tribble on behalf of Mammoth and Cobra included, but were not limited to:

a.      Hotel accommodations in New York City on or about January 31 to February 2, 2018;

b.      A helicopter tour over Puerto Rico on or about February 7, 2018;

c.      Assistance procuring an apartment in New York City during or about February 2018;

d.      The negotiation and hiring of Tribble's friend at FEMA, Jovanda Patterson, by Cobra Energy, beginning during or about March 2018 and culminating in July 2018;

e.      Hotel accommodations in Fort Lauderdale, Florida on or about July 17 to 18, 2018;

f.      Airfare from Miami to Orlando, Florida on or about July 20, 2018;

g.      First class airfare from San Juan, Puerto Rico to New York on or about September 22, 2018;

h.      Personal security services in or about November and December 2018;

i.      Roundtrip airfare from Washington, D.C. to Charlotte, North Carolina on or about November 29 to 30, 2018;
j.      Hotel accommodations in Charlotte, North Carolina on or about November 29 to 30, 2018;

k.      Access to and use of Ellison's credit card; and

l.      Access to and use of an apartment in San Juan, Puerto Rico.

97.     Pursuant to the Indictment and in furtherance of the conspiracy, in exchange for the bribes Tribble performed various acts for the benefit of Cobra and Mammoth and to the detriment of Foreman Electric and other contractors including, but not limited to:

m.      Influencing, advising, and pressuring FEMA employees and PREPA executives including, but not limited to, its CEO and division directors, to accelerate payments to Cobra, assign tasks to Cobra instead of to PREPA employees, use Cobra in restoration tasks to the exclusion of any other

20

contractor, advance Cobra's interests and secure favorable treatment for Cobra in connection with the contracts signed between PREPA and Cobra, the payment of project work billed under the contracts, and the project work assigned by PREPA to Cobra pursuant to those contracts;

n.      Influencing, providing advice to, and pressuring FEMA employees concerning FEMA procedures for the approval of FEMA reimbursements for Cobra work under the First and Second Cobra Contracts;

o.      Providing Cobra with information not readily accessible to it through other means;

p.      Causing the December 23, 2017 FEMA letter to be sent to the Government of Puerto Rico advising that FEMA had determined the costs under the First Cobra Contract to be reasonable;

q.      On or about February 11, 2018, directing PREPA executives to use Cobra personnel to repair damage to the Monacillos substation;

r.      From during or about March to November 2018, directing PREPA executives and FEMA officials to facilitate the entry by the Local Redevelopment Authority for Naval Station Roosevelt Roads into an agreement with PREPA for Cobra to perform repair work at Roosevelt Roads;

s.      From during or about January to October 2018, directing PREPA executives to accept the specifications of a Cobra design for the electric power distribution system in Viequez and to engage Cobra in the execution of the proposed redesign.

98.     Tribble, as a FEMA employee, was prohibited from directly or indirectly soliciting or accepting a gift from a prohibited source; or soliciting or accepting a gift to be given because of her official position. 5. C.F.R. § 2635.2020(a) and (b). A prohibited source means any person who is seeking official action by the employee's agency; does business or seeks to do business with the employee's agency; conducts activities regulated by the employee's agency; has interests that may be substantially affected by the performance or nonperformance of the employee's official duties; or is an organization a majority of whose members are described in paragraphs (d)(1) through (4) of 5 C.F.R. § 2635.203(d).

99.     Pursuant to the Indictment, it was further part of the conspiracy that Tribble attempted to conceal her frequent communications with Ellison by using her private email account, private cellular number, a disposable prepaid cellular number, Apple iMessages, SMS texts, and photographs, rather than by using her FEMA issued email account or her FEMA issued cellular phone.

100.    However, upon information and belief, Tribble used government-owned computers and phones to access her personal email account or otherwise communicate with Ellison in furtherance of the conspiracy.

101.    Further, pursuant to the Indictment and upon information and belief, Tribble used her government-issued email address to communicate with Ellison and Patterson in furtherance of the conspiracy.

102.    Tribble used her power and influence to obtain the approval of the Cobra contract for up to $200 million and to direct that a letter be sent to the Government of Puerto Rico stating that FEMA found costs under the First Cobra Contract to be reasonable. The DHS-OIG later issued a memorandum on July 3, 2019, finding that FEMA's cost eligibility determination with respect to the First Cobra Contract was unsound and unsupported.

103.    Pursuant to the Indictment and in furtherance of the conspiracy, on January 25, 2018, using her personal gmail account, Tribble sent an email to Ellison's Mammoth account requesting that he arrange hotel rooms for her in New York City from January 31 to February 2, 2018.

104.    Pursuant to the Indictment and in furtherance of the conspiracy, on February 7, 2018, Ellison flew Tribble on a helicopter tour of areas in Puerto Rico.

105.     Pursuant to the Indictment and in furtherance of the conspiracy, on February 9, 2018, Tribble received an email to her FEMA account from a PREPA consultant requesting that she review the proposed Amendment 5 to the First Cobra contract, increasing its value from $445,429,800 to $945,429,800. The same day, Tribble forwarded the same email to her personal gmail account, and then on the same day forwarded the email again from her personal account to Ellison's Mammoth address.  Tellingly, Cobra, in conjunction with its lawsuit with fellow contractor MasTec, refuses to provide documentation it received, because it appears that Cobra has now paid MasTec to go away, in an attempt to preserve its desperate, continuing, bid to procure an additional, ill-awarded payment of more than $350 million (this is in addition to the more than one billion dollars that Cobra has already received due to the illicit enterprise in which it directly participated.

106.     Tribble even sent an email from her personal account to Ellison, requesting that Ellison *"take care"* of Jovanda Patterson (a friend of Tribble and the FEMA Deputy Chief of Staff assigned to San Juan, Puerto Rico). Tribble further stated that Patterson's FEMA salary was inadequate for a move to New York. Ellison responded that he would provide a position with Cobra to assist with coordination efforts in Puerto Rico.  Cobra made good on its promise: Cobra's Director of Human Resources and Administration emailed Patterson (at her gmail account, not her government account) to offer her an annual salary of $160,000 and a bonus opportunity for up to 30% of that annual salary, plus a per diem amount bringing her potential annual compensation to $274,000.

107.     On or about June 5, 2018, Patterson accepted an employment offer from Cobra while she was in a position to affect the award of contracts and work orders.

108.     Patterson resigned from her position with FEMA on or about July 2018.

109.     While negotiating prospective employment with Cobra, Patterson participated in an evaluation of Cobra that affected its ability to bid on potential contracts.

110.     Upon information and belief, Patterson's helped COBRA obtain contracts and work orders in response to her employment offer and acceptance thereof.

111.     Pursuant to the Indictment and in furtherance of the conspiracy, beginning in March 2018, Cobra worked secretly with Tribble to develop a large, high-value project for the redesign of the electrical distribution system in Vieques that would be assigned to Cobra and funded with disaster relief funds. Ellison created a description of the project and sent it to Tribble's gmail account in a document entitled *"PR Electrical Grid – Standardization Modernization and Hardening of Infrastructure (Draft in Process)"* on March 30, 2019—the day after RFP-77844 was awarded to Foreman Electric, MasTec, and Cobra. Attaching comments to the document, Tribble responded,

> *"This is fantastic. Thank you. I have some comments in the attached just for clarification. Then I want to push a little more on the pros/cons of a COOP model. I will write it and share it for comment. Will you be in early enough to meet the FEMA administrator (your fellow southerner) on Thursday?"*

112.     On April 4, 2018, Tribble documented that she was proposing a redesign of the Vieques distribution system to FEMA and PREPA officials, ostensibly taking credit for the idea and concealing Cobra's own self-interested hand in drafting the proposal.

113.     Pursuant to the Indictment and in furtherance of the conspiracy, on April 8, 2018, using her private gmail account, Tribble forwarded official communications regarding the Vieques proposal to Ellison at his Mammoth address. The same day, she sent an email from her FEMA account to several persons, including Ellison, stating, *"After several conversations over the last few days, I need have [sic] a meeting with this group regarding Vieques. There is a lot happening around us and we need to be in sync on moving forward. We have an opportunity to do what is*

*right for the citizens of Vieques and PR and install confidence in our future reconstruction effort. I would like this group to meet as soon as possible. There is a hearing in DC on April 11 and on Friday there is a local hearing in Vieques both on PREPA. I really want to settle on a path forward with this team or clearly define the roadblocks. Please let me know if Monday at 5:00pm works."*

114.    With her message, Tribble again made it appear as though Cobra/Mammoth was only just being introduced to the idea of a redesign of the Vieques distribution system, thereby suppressing the reality that the project specifically had been designed to earn Cobra further profits.

Pursuant to the Indictment and in furtherance of the conspiracy, on April 10, 2018, Tribble forwarded Ellison an email she had received on March 27, 2018 containing fact sheets for the restoration of Vieques and Culebra. One of the documents referenced was listed as "Official Use Only" and was not meant to be shared with the public.

115.    Pursuant to the Indictment and in furtherance of the conspiracy, on April 16, 2018, Ellison sent an email to Tribble's personal email account concerning the Puerto Rico Electrical Grid Standardization, Modernization, and Hardening, stating *"I am about to send an email to AEP [American Electric Power, a utility] and Oncor [another utility] asking the questions and tying you into the conversation. If that's ok?"*

116.    Pursuant to the Indictment and in furtherance of the conspiracy, on April 21, 2018, Ellison sent an email to Tribble with a FEMA Project Worksheet balance attached as a Microsoft Excel spreadsheet, stating, *"Check out the tab labeled amendment 6. It is a big number if we want to fund the additional labor and cover the material for Vieques and [C]ulebra. $500mm."* Tribble responded the same day, *"I have it but I need a burn rate vs number of people. And we need to decide if the 110T/200D is the right mix. Also, if we have to break out Vieques and Culebra what is it?"*

117.     Pursuant to the Indictment and in furtherance of the conspiracy, on June 2, 2018, using her personal account, Tribble sent Ellison an email stating, *"What else needs to happen besides my draft below. See Jim's email below that. Here are the things that need to happen: 1)get further along in engineering with certification from a PR engineer. That is underway by TRC and Cobra.??  2)get the PW funded (3-4 weeks). 3)cobra to order materials (need approval from PREPA). 4)Cobra needs a work release from PREPA. 5) you should see a larger presence on the island by…."*

118.     Pursuant to the Indictment and in furtherance of the conspiracy, on June 3, 2018, Tribble forwarded a chain of official emails from her FEMA account through her gmail account to Ellison with the subject line *"$200M behind in payment to Cobra – stop work looming again."*

119.     In a further effort to get the proposal approved, pursuant to the Indictment and in furtherance of the conspiracy, on or about June 15, 2018, Tribble instructed, advised, and pressured PREPA personnel to utilize an independent consultant's findings, rather than PREPA's own assessment, to establish voltage levels for the work plan being developed for Vieques.

120.     Pursuant to the Indictment and in furtherance of the conspiracy, on July 22, 2018, Tribble forwarded another email regarding the reconstruction project on Vieques to Ellison through her gmail account stating, *"Sending again. Jim is trying to help. Need to make that relationship in Vieques. Environmental will be our biggest issue. Also there is another opportunity for the hearing. Need a quick call on this."*

121.     In furtherance of the conspiracy, on September 14, 2018, Tribble forwarded to Ellison, through her personal email account, official PREPA meeting notes about a call between FEMA and PREPA showing that the topics discussed during the call included whether PREPA wanted to use Cobra for the permanent work project on Vieques.

122.     In furtherance of the conspiracy, from March to November 2018, Tribble also began pressuring and directing PREPA personnel to enter into an agreement with Cobra to provide repair services to an area known as Roosevelt Roads.

123.     On March 28, 2018, Tribble sent an email to a FEMA official advising of her scheme to use a PREPA memorandum of understanding to provide repair services to the area.

124.     On or about August 8, 2018, she again emailed a FEMA official and instructed the official to provide the necessary data for Cobra to perform the repair work at Roosevelt Roads.

125.     On or about August 12 and 13, 2018, she emailed and instructed a FEMA official that PREPA had no authority over the obligation amount associated with the Roosevelt Roads repair work because the amount was established between FEMA and LRA.

126.     On or about November 8, 2018, Tribble emailed a FEMA official and instructed that assistance be provided to Cobra to invoice for repair work performed at Roosevelt Roads.

127.     Pursuant to the Indictment and in furtherance of the conspiracy, on or about August 20, 2018, Tribble received a text message from a FEMA employee stating, *"Hey Boss. Meeting at RR with all players. Agreement on scope with 1 substation. Concern: Cobra is saying $9mil. RFP came in at $2.8 and $6mil. How do we proceed?"* Tribble forwarded the message to Ellison the same day with the message: *"Please help me on this."*

128.     Pursuant to the Indictment and in furtherance of the conspiracy, on September 8, 2018, Ellison purchased $3,000 in casino chips at the Casino Del Mar in Puerto Rico and surveillance footage from the Casino on that day show Ellison and Tribble in the Casino together at the cash cage as well as at the gambling tables.

129.     Pursuant to the Indictment and in furtherance of the conspiracy, during or about November or December 2018, Ellison paid for personal security services for Tribble.

130.    Pursuant to the Indictment and in furtherance of the conspiracy, Tribble also kept photographs of the front and back of Ellison's credit card in her iCloud Photo Library, which Ellison had sent to Tribble for her personal use in exchange for her official actions securing favorable treatment for Cobra. For example, on December 24, 2018, Ellison exchanged Apple iMessages with Tribble allowing her to use the card for travel expenses.

131.    Pursuant to the Indictment and in furtherance of the conspiracy, in his own iCloud Photo Library, Ellison kept a photograph of a competitor's rate schedule, presumably belonging to Foreman Electric or MasTec, that was submitted in response to RFP-77844 and was not readily accessible to Ellison through any means other than from Tribble.

132.    Pursuant to the Indictment and in furtherance of the conspiracy, Tribble and Ellison exchanged various text messages over the duration of the conspiracy to fraudulently increase the value of Cobra's contract following the hurricane, including but not limited to the following exchanges:

t.    Tribble, *"Finished amendment approval!!!! BUT…I asked them to add materials and $$. Meeting at 3pm to discuss. Told them if it takes more than 24 hrs to approve drop materials push forward original amendment tonightt [sic].* Ellison, *"You are awesome, but you knew that!"   *   *   *

u.    Tribble, *"Amendment good. I have a meeting on payment tomorrow. It is going to take a minute for them to catch up to $200M. Just popped off on Fernando. Now after Todd for invoices."* Ellison, *"I just need $30-40mm and the amendment. I have two weeks of cash in me."* Tribble, *"Okay. I'm on it."* Ellison, *"Stop popping off!!!!!!!!!!!! Love you for doing it. And yes ride or die but do not hurt yourself. You have a team to take care of too!!!"* Tribble, *"Call me before you pass out."*

v.    Tribble, *"Trying to look up on BLS what industry TCIR is. The DART (which I didn't understand) is super low. Man hours is crazy. Lines assigned is misleading. PREPA assigned a bunch of lines to themselves that did not require any work. You got lines that were completely jacked up. Got FOMB approval."*  *   *   *   *"Please call.  Amendment [attached] Did you get this"* Ellison, *"I got this"*

28

133. Despite claims from PREPA, FEMA and others that this was simply a clerical error of sorts, all work related to RFP-77844 continued to be assigned to Cobra.

134. Upon information and belief, Cobra charged significantly higher rates for its services than the rates offered by Foreman Electric—by a factor of at least 50%.

135. Through their significant bribes to Tribble and hiring of Patterson, Mammoth and Cobra were able to take advantage of the public disaster relief money that was appropriated as a result of the category 5 storm that fell upon Puerto Rico, charging exorbitant rates for their work and directing all work to themselves. Because their conduct left the island with only one contractor performing all work, to the detriment of the public the actual repair work also was slowed down significantly.

136. Through several misrepresentations by PREPA, Cobra and others, Plaintiff was led to believe that Cobra had been paid all monies to be received from PREPA (through grants from FEMA), which was revealed to be patently false when PREPA and Cobra announced their intention to facilitate additional payments to Cobra in the Notice of Settlement.

137. And, to be absolutely sure of the positions that Defendants take – Cobra itself claims that the stipulations of fact in the criminal actions do not relate to the contracts at issue:[3]

> *importantly, as detailed in the stipulation of facts accompanying the plea agreement, the gratuity charge was unrelated to the Contracts and the plea agreement makes no mention of any conduct related to the Contracts in any way, the work that Cobra performed under the Contracts or Cobra's right to be paid for such work.*

DE 5349 at 4, FN 8.

---

[3] COBRA ACQUISITIONS LLC'S REPLY IN SUPPORT OF MOTION OF PUERTO RICO ELECTRIC POWER AUTHORITY PURSUANT TO BANKRUPTCY CODE SECTIONS 362 AND 503(B), AND BANKRUPTCY RULE 9019 FOR ORDER (I) APPROVING SETTLEMENT AGREEMENT WITH COBRA ACQUISITIONS LLC, (II) ENFORCING THE AUTOMATIC STAY WITH RESPECT TO CERTAIN MUNICIPAL GARNISHMENTS, (III) AUTHORIZING THE DISTRIBUTION OF RESERVED FUNDS AND OTHER SETTLEMENT PAYMENTS, AND (IV) GRANTING RELATED RELIEF. DE 5349 at 4, FN 8.

138.     Further, Mark Merritt, who served for COR3 as part of the Unified Command Group ("UCG"), which oversaw the recovery, and included representatives of the Puerto Rico Electric Power Authority ("PREPA") and FEMA in his own declaration **dated December 14, 2022**, stated under oath that, as to his knowledge, neither Tribble, Cobra nor anyone else acted to steer contracts to Cobra or any other preferred party.  This was proffered in response to litigation involving Foreman, and again was the product of an ongoing attempt to mislead Plaintiff into believing that no corrupt activities would be honored, much less ever occurred.

139.     However, Asha Tribble, who at the time was FEMA's Deputy Regional Administrator for Region II (serving New Jersey, New York, Puerto Rico, and the U.S. Virgin Islands) began, though it is not exactly certain as to when, accepting bribes from Ellison, Cobra's then-president.

140.     In providing these bribes, Ellison sought to, and did, induce Tribble into diverting all restoration work to Cobra, to Foreman's detriment. Ellison's bribes took many forms: hotel accommodations in New York (from January 31 through February 2, 2018), in Fort Lauderdale (from July 17 to 18, 2018), and in North Carolina (from November 29 to 30, 2018); a helicopter tour of Puerto Rico in February 2018; plane tickets for travel from Miami to Orlando (on July 20, 2018), from San Juan to New York (first class, on September 22, 2018), and from Washington, D.C. to Charlotte, North Carolina, roundtrip (on November 29 and 30, 2018); personal security services in November and December 2018; use of an apartment in San Juan, Puerto Rico; assistance, in February 2018, with securing an apartment in New York City; and access to Ellison's personal credit card for Tribble's own use, extending at least into December 2018.

141.    Further, and in further participation in the pattern of racketeering activity, in March 2018, Tribble contacted Ellison about securing a job at Cobra, or a Cobra affiliate, for her friend, Jovanda Patterson.

142.    On June 1, 2018, a Cobra affiliate, at Ellison's prompting, it appears, offered Patterson a lucrative position, more than doubling her current salary at FEMA.

143.    While Foreman was strung along by FEMA (through Tribble or her reports), who blamed PREPA for failing to assign any work to Foreman, Tribble and Ellison were in constant communication, often through their personal cell phone and email accounts.

144.    Tribble, in exchange for bribes from Ellison, shared critical insider information and confidential documents (including contractors' own proprietary information), and the status of Hurricane Maria restoration projects in Puerto Rico.

145.    Throughout their communications, Ellison and Tribble also plotted to manufacture restoration-work opportunities that were to be funneled to Cobra and used to bolster Tribble's reputation within FEMA, by having her take credit for various projects.

146.    Specifically, in March and April 2018, Tribble and Ellison coordinated a workplan that would result in Cobra's involvement in a redesign and "hardening" of the distribution system in Vieques, a small island- municipality off the east coast of Puerto Rico.

147.    Tribble, based on documents prepared by Cobra and provided by Ellison, proposed the system redesign to FEMA and PREPA officials.

148.    Tribble shared FEMA documents marked for "Official Use Only" with Ellison.

149.    While orchestrating work for Cobra on Vieques (and another island municipality, Culebra), and other behind-the-scenes maneuverings, Tribble also sought to manufacture restoration work for Cobra at the Roosevelt Roads Naval Station.

150. While the restoration of Puerto Rico's electric grid was finally completed in April 2019, Foreman never received a single work order or any compensation whatsoever arising out of its contract.

151. Ultimately, and as a result of Tribble and Ellison's secret communications and scheming, Tribble, lied to Foreman and intentionally kept Foreman unapprised of what was happening.

152. As a result of this scheme, Tribble and Ellison, on September 10, 2019, were indicted, along with Patterson, by a federal grand jury in the District of Puerto Rico.  The indictment included fifteen counts, among them counts for conspiracy to commit bribery, honest-services wire fraud, disaster fraud, and wire fraud.  As a result of the scheme, it was Cobra and Mammoth who ultimately received more than $1.1 billion in payments for their alleged work.

*COR3's Involvement*

153. FEMA allocates federal funds to the Government of Puerto Rico, which are managed by COR3.

154. In order to facilitate the movement of federal funds, COR3 works with the submission of Project Worksheets (hereinafter "PWs") to FEMA.  Importantly, if a PW is not properly or timely submitted by COR3, then the contractor at issue risks losing all of its time and resources spent to mobilize.

155. COR3 uses both public and private companies to undertake various functions within its mission.  These private companies include assessment and engineering firms.

156. The then-head of COR3 was Jose Marrero.  Marrero is now the secretary of State of Puerto Rico.  He was previously the Authorized representative of the Governor to FEMA.  While head of COR3, Marrero was also the head of the OMB for Puerto Rico.

157.     Mark Merritt was a private contractor who represented COR3 at meetings between FEMA, PREPA, Foreman, and Cobra that COR3 was an instrumental actor in the process of allocating funds.  On information an belief, Merritt had responsibility for ultimately deciding what PWs were submitted to FEMA.

158.     In short, the power to submit PWs means that power to assign work.

159.     Despite representations to the contrary, COR3 failed to submit Foreman's PW's to FEMA.

160.     This was due to the fact that COR3 favored providing work to Cobra.

161.     Merritt intimated to Foreman during a meeting that his preference would be to submit PWs for Cobra.

162.     When Foreman was told by Jose Ortiz, then-CEO of PREPA, that PREPA had indeed submitted a Project Worksheet to COR3 in February of 2019, Foreman received word through a third party that COR3 would not be submitting their project worksheet to FEMA.

163.     Then, Jose Ortiz's cousin, Jordan Orrosco, approached Bront Bird, CEO of Foreman, to sign deals that would allow Orrosco and his associates to take over Foreman's contract position.  Given the explicit threats to never submit a PW for Foreman by COR3, who has control over the PW process, and the fact Omar Marrero had just said in order to do business, Foreman would have to work with his people, it was clear that something was wrong and that PREPA was not going to do anything about.

164.     After further investigation by Plaintiff, and as stated herein, it turned out that this was another part and parcel of the ongoing fraud against Plaintiff and all other stakeholders.

<u>Foreman Has Suffered Substantial Damages</u>

165.     As a result of the fraudulent practices and behavior detailed herein, Foreman
suffered nine figures in damages. When Foreman received its notice of an award under RFP 77844,
Foreman incurred preparatory expenses that would be necessitated by its performance.  Although
the Award allocated $250,000,000 to Foreman in exchange for its electric grid restoration work,
Foreman has now come to know that the funds had been misappropriated and diverted to Cobra.

166.     Since then, Mammoth's and Cobra's statements and practices have led Foreman
to believe that Mammoth and Cobra will not be able to satisfy a judgment entered in favor of
Foreman. Through its treasury management system, Mammoth drains the funds from its
subsidiaries as quickly as they are received. Meanwhile, the Wexford Loan Agreement ensures
that Mammoth's coffers are similarly emptied for the benefit of Wexford.

## COUNT I

## Violation of 18 U.S.C. § 1964(c)

## (Against All Defendants)

167.     Plaintiff incorporates by reference all preceding paragraphs, as if fully set forth
herein.

168.     Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who
conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18
U.S.C. § 1962(c).

169.     The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4)
consisting of (i) Defendants, including their employees and agents.  The enterprise is an ongoing
organization that functions as a continuing unit. The enterprise was created and used as a tool to
effectuate Defendants' pattern of racketeering activity.

170.     The Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of directing work to a single contractor, Cobra, in exchange for undisclosed commissions or kickbacks, including by promises of lucrative employment within Cobra, while overpaying for services, unlawfully excluding Foreman, and earning profits therefrom.

171.     Defendants have conducted and participated in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

172.     The enterprise engaged in and affected interstate commerce, because, *inter alia*, PREPA allowed (and in contravention of its own resolutions and the MSA signed by Cobra), the rigging of a procurement process for the supply of restoration services, at costs exceeding $1 billion, that will ultimately be borne by the people of Puerto Rico.

173.     Defendants exerted control over the enterprise, and Defendants participated in the operation or management of the affairs of the enterprise.

174.     The contracts between Cobra and PREPA incorporate all legally required laws by reference.

175.     Because the contracts were funded by Federal grant dollars, Federal Acquisition Regulation ("FAR") Clause 52.203-11 was required by law to be included in all contracts between Cobra and PREPA. 48 CFR § 3.808.

176.     FAR Clause 52.203-11 requires that "The offeror, by signing its offer, hereby certifies to the best of its knowledge and belief that ***no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or***

*employee of any agency*, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress on its behalf *in connection with the awarding of this contract*" (emphasis added).

177.     Clauses in each of its contracts with PREPA also required that Cobra acknowledge "that starting on October 25, 2017, FEMA financial assistance will be used to fund this Contract. From and after this date, the Contractor *shall comply with applicable Federal and Commonwealth of Puerto Rico laws*, regulations, executive orders, policies, procedures, and directives, including but not limited to the Federal Cost Principles set forth in 2 C.F.R. Part 200 for Contractor's material costs, and applicable FEMA regulations in 44 C.F.R. Chapter I.

178.     Pursuant to 18 US.C. § 287, "Whoever *makes or presents to any person or officer in the civil*, military, or naval service of the United States, *or to any department or agency thereof*, *any claim upon or against the United States*, or any department or agency thereof, *knowing such claim to be false, fictitious, or fraudulent*, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title" (emphasis added).

179.     Additionally, under 18 U.S.C. § 286, "Whoever *enters into any agreement, combination, or conspiracy to defraud the United States*, or any department or agency thereof, by *obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim*, shall be fined under this title or imprisoned not more than ten years, or both" (emphasis added).

180.     Finally, it is unlawful under 18 U.S.C. § 1962 "for *any person employed by or associated with any enterprise engaged in*, or the activities of which affect, interstate or foreign commerce, *to conduct or participate, directly or indirectly*, in the conduct of such enterprise's

affairs through a pattern of racketeering activity or ***collection of unlawful debt***" (emphasis added) or to conspire with any other person or entity to do the same.

181.     Any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962 may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. 18 U.S.C. § 1964(c).

182.     By offering bribes and colluding with Tribble, Patterson and COR3 to both obtain contracts for Federal grant funds and to receive additional work under those contracts, and to advance their own positions both financially and professionally. Cobra violated FAR Clause 52.203-11.

183.     By knowingly submitting claims for payment to PREPA for work and contracts awarded as a result of the bribery scheme and thereby breaching FAR Clause 52.203-11, Cobra also repeatedly violated 18 US.C. § 287 by causing a false or fraudulent claim for payment to be submitted against Federal grant dollars.

184.     Because Tribble, Cobra, and PREPA colluded together to progress the bribery scheme, all three repeatedly violated 18 US.C. § 286.

185.     By the same conduct, Tribble, Cobra, and PREPA violated the RICO statute, 18 U.S.C. § 1962, given that the debts invoiced by Cobra for the money and work received as a result of bribery were not lawful. Additionally, by reasserting its claims for payment through this bankruptcy action, Cobra has continued and furthered its conspiracy to collect an unlawful debt.

186.     PREPA has also continued to be complicit in the RICO conspiracy by failing to defend its bankruptcy position against Cobra in good faith, including, but not limited to, failing to make any fact discovery efforts in this action prior to reaching settlement with Cobra.  PREPA

chose not to do this because it agreed to engage in the conspiracy with COR3, its principals and others, and any substantive fact discovery would shine a light on the ongoing conspiracy.

187.     PREPA failed to report violations of the law as incorporated in, but not limited to, the Cobra MSA, and PREPA's own resolutions.

188.     Foreman Electric Services was damaged by the conduct of Cobra, PREPA, and Tribble, because work and resulting payments it should have received under its own contract with PREPA were instead diverted to Cobra as part of the bribery scheme.

189.     As a result, Plaintiff suffered over $100,000,000 in damages.

## COUNT II

**Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. § 1962(c)**

**(Against All Defendants)**

190.     Plaintiff incorporates by reference all preceding paragraphs, as if fully set forth herein.

191.     Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

192.     Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) Enterprise described previously through a pattern of racketeering activity.

193.     As demonstrated in detail above, Defendants as co-conspirators, have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the

194.     conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs of money.

195.     The nature of the above-described Defendants' co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

196.     As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs have been and are continuing to be injured in their business or property, as set forth more fully above.

197.     Defendants have sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

   a.   Multiple instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1342;

   b.   Multiple instances of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; and

   c.   Multiple instances of wire fraud in violation of 18 U.S.C. §§ 1343 and 1346.

198.     Defendants have sought to and have engaged in the violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

199.     As a result, Plaintiff suffered over $100,000,000 in damages.

## COUNT III

## Common Law Fraud

**(Against PREPA)**

200.    Plaintiff repeats and alleges the allegations contained in each preceding paragraph of the Complaint as set forth fully herein.

201.    PREPA had a special contractual relationship with all of its approved contractors, including Plaintiff.

202.    PREPA had a special, but unlawful relationship with Cobra and, through Tribble and Patterson, FEMA.

203.    PREPA participated in making material misstatements of fact to Plaintiff, or at the very least allowing material misstatements of fact to be made to Plaintiff with the understanding that Plaintiff would rely on those material misstatements.

204.    Plaintiff relied on the material misstatements to its detriment and suffered damages as a result.

205.    PREPA knew that the statements would serve to further the fraud and conspiracy to commit the same.

206.    PREPA knew that the explanation provided to Plaintiff would be utilized to defraud all current and future vendors of PREPA as all work was intentionally being steered to Cobra.

207.    PREPA knew that by allowing Cobra to be awarded all work, Plaintiff was to be defrauded.  Alternatively, Plaintiff was within a class of persons PREPA knew were to be defrauded, i.e., all non-Cobra vendors at the time.

208.    PREPA knowingly allowed its agents to make the material misrepresentations to Plaintiff.

209.    PREPA knowingly placed its agents in a position to commit fraud upon the Plaintiff and its agent did so while acting within the granted scope of authority. Accordingly, PREPA is liable for the acts done pursuant to that agency.

210.    PREPA had the ability to thwart the efforts to defraud Plaintiff.

211.    As a result, Plaintiff suffered over $100,000,000 in damages.

## COUNT IV

## Aiding and Abetting Fraud

## (Against Cobra)

212.    Plaintiff repeats and alleges the allegations contained in each preceding paragraph of the Complaint as set forth fully herein.

213.    As described above, the scheme constituted a fraud. As detailed above, Cobra had knowledge of the Scheme.

214.    As described above, Cobra provided substantial assistance to advance the scheme's commission and this substantial assistance proximately caused harm to not only Plaintiff, but Debtor as well

215.    Cobra knew that PREPA and were seeking to defraud contractors, stakeholders, creditors, the Trustee and this Court.  Cobra repeatedly requested that PREPA pay it funds that it knew were or would be unlawful, and known by FEMA to be a fraudulent vehicle.

216.    Cobra knew that its own creditor, Wexford, would be guaranteed funds by Cobra while Cobra's fellow contractors (Plaintiff and MasTec) would be further defrauded through this request. Alternatively, the Plaintiff is within a class of persons Defendants knew were to be defrauded.

217.    Cobra had an extraordinary economic motivation to substantially assist the fraud. Aside from jeopardizing PREPA's ability to pay contractors, other creditors, and the fair allocation of taxpayer monies as required under the regulations governing PREPA, Cobra also know that, since the plea agreements omitted crucial information,  exposure of the fraud and Cobra's role would reveal publicly Cobra's participation in the conspiracy and damage its standing with shareholders – shareholders whom Cobra preemptively promised that it would reward from a settlement not yet even approved by this Court.

218.    Cobra substantially assisted, aided, abetted, encouraged, concealed and facilitated the fraud upon the Plaintiff, other stakeholders and the Court by:

(a)  Failing to retract or correct the false statements;

(b)  Knowingly permitting its name, employees and agents to be used in furtherance of the conspiracy;

(c)  Demanding and accepting the entire payment from PREPA – despite a duty of candor to this Court and the Estate

(d)  in an atypical and improper manner; failing to disclose the Conspiracy to anyone, including but not limited to the Plaintiff, other stakeholders (including the several municipalities that have lodged serious concerns with this Court via their objections and other filings)

(e)  Cobra's substantial assistance was intended to aid the primary fraud.

219.    Cobra had a duty to disclose the truth to the Court, Plaintiff, Trustee and all other stakeholders. This is based on, among other things (i) its special relationship with PREPA (as evidenced through uncontested plea agreements), and its ability to control PREPA via its relationship with FEMA (which is also outlined in full in the relevant criminal proceedings), the

vehicle through which the Plaintiff, MasTec and others were defrauded; and its communications to PREPA.

220.    Cobra's substantial assistance was a substantial factor in furthering the fraud upon the Plaintiff, Trustee, this Court and all other stakeholders (including the municipalities).

221.    As a result, the Plaintiff suffered over $100,000,000 in damages.

222.    Accordingly, Plaintiff is entitled to judgment against Cobra in an amount to be determined at trial plus interest.

**COUNT III**

**Fraud By Omission**

**(Against PREPA)**

223.    Plaintiff repeats and alleges the allegations contained in each preceding paragraph of the Complaint as set forth fully herein.

224.    PREPA had a duty to disclose that its statements to Plaintiff were incomplete, false or misleading, and to correct it. PREPA was obligated to make complete and accurate disclosures, both under law and controlling regulation. PREPA failed to do so. The representations were material.

225.    Plaintiff justifiably relied upon the Recommendation Letter to their detriment and as a result the Palm Beach Funds were damaged.

226.    PREPA understood that its knowledge of the fraud amf conspiracy was material to the Plaintiff, among others, and that the Plaintiff would not continue to expend massive amounts of funds to mobilize and remain available to the people of Puerto Rico (as Plaintiff had been doing as an existing contractor with the Army Corps of Engineers) if it knew the truth.

227.     PREPA knew that the Plaintiff would not continue to hemorrhage capital if it knew the truth that it Plaintiff would receive no work.

228.     PREPA and the other defendants actively concealed and delayed the discovery by the Plaintiff of PREPA's negligence.

229.     As a result, Plaintiff suffered over $100,000,000 in damages.

230.     Accordingly, Plaintiff is entitled to judgment against PREPA in an amount to be determined at trial plus interest.

**COUNT IV**

**Breach of Fiduciary Duty**

**(Against PREPA)**

231.     Plaintiff repeats and alleges the allegations contained in each preceding paragraph of the Complaint as set forth fully herein.

232.     At all relevant times, in its capacity as a contracting entity with Plaintiff, owed Plaintiff the strictest fiduciary duties, including duties of care, good faith, loyalty, honesty, candor, and full disclosure as well as the utmost confidence and trust. Defendant was required to act in the best interests of its constituents – the people of Puerto Rico – and not for its own benefit, benefit of its agents, or for the direct or indirect benefit of anyone else.  This includes the recently-announced proposed Settlement.  PREPA was insolvent or in the zone of insolvency at all material times hereto, owed fiduciary duties to the Plaintiff, and as described above, agreed to continue acting in concert with Cobra to fulfill a payment that is and remains unfair to the Estate, Plaintiff, all other stakeholders (including the municipalities) and in approving the issuance thereof, profited therefrom without disclosing the same to the necessary parties – including but not limited to this Court, Plaintiff, all other stakeholders and the Trustee.

233.     By engaging in the conduct described above, PREPA breached its fiduciary duties to Plaintiff (not only as a party in interest, but as an initially-awarded contractor), this Court, other stakeholders (including the municipalities) and the Trustee.

234.     In addition, because the Debtor was insolvent or in the "zone of insolvency" at the time of the conduct described above, Debtor breached its fiduciary duties to to Plaintiff (not only as a party in interest, but as an initially-awarded contractor), this Court, other stakeholders (including the municipalities) and the Trustee.

235.     The actions of Defendant, described above, involved intentional misconduct, fraud, and/or a knowing violation of the law.

236.     These breaches of fiduciary duties directly and proximately caused substantial harm to the Plaintiff and to the Debtor's creditors in an amount to be determined at trial.

237.     As a result, Plaintiff suffered over $100,000,000 in damages.

238.     Accordingly, the Plaintiff is entitled to judgment in an amount to be determined at trial, plus interest.

## COUNT V

### Aiding and Abetting Breach of Fiduciary Duty

### (Against Cobra)

239.     Plaintiff repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

240.     Acting in concert with the Debtor (as the United States Government rightfully determined), Cobra conspired to and participated in instances where fraudulent bases were provided for the purpose of assigning work, of course only to Cobra, and that fraudulent nature of the bid process was never disclosed to Plaintiff, or others (including this Court, and the American

taxpayer by virtue of an attempt to hid plea information, which will be the subject of a FOIA request should the matter not be reopened by the Department of Justice).

241.    Cobra and its employees owed the Debtor a duty to investigate, monitor, and verify the veracity of information submitted to them Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett in performing its role as Debtor's underwriter, investment adviser, broker, fiduciary, agent, and in rendering expert advice.

242.    Cobra and its employees knew that PREPA was being induced to steer all work to Cobra, and assisted in doing so, despite the most sincere need to restore basic infrastructure to the people of Puerto Rico.

243.    This also impinged upon other relevant parties in interest – including but not limited to the municipalities and bondholders – whom have yet to see any promise of a return, let alone a single dollar, which again will only spill forth into the next crisis for which the innocent people of Puerto Rico and the larger taxpayer-funded regime will have to pay, while Cobra, in the interim, announces to its shareholders that it will see massive profits, again.

244.    Cobra and its employees possessed a general awareness that PREPA was conducting a scheme to preferentially award contracts in order to assuage a FEMA official that ultimately admitted, in criminal court, to working hand-in-hand with Cobra to ensure that Cobra received all contracts, and if not, FEMA would withhold funds (or at least threaten to do so, in the midst of one of the worst natural disasters in Puerto Rican history).

245.    PREPA and its employees rubber stamped the Cobra assignments knowing that they were fraudulent because Cobra and its employees were colluding with FEMA (as admitted in the criminal case), and because FEMA had threatened to withhold funds should its representative not rule over contracts with an iron fist.  At the very least, Cobra and its employees consciously

disregarded the fraudulent nature of the Grafton Audited Financials and the Scheme in order to later have the ability to deny such knowledge.

246.    Through its participation in the scheme, Cobra and its employees received concrete and personal benefits from the consummation of the scheme.

247.    Cobra and its employees had access to documentation that provided details concerning the nature of the scheme and thus, Cobra had the means of knowledge to discover the looting as well as the other harms to the Debtor, and all contracted entities (i.e., Plaintiff and MasTec) resulting from the Scheme.

248.    Plaintiff is in the class of likely victims of any scheme to preferentially assign government contracts (all of which are subject to a procurement process designed specifically to root out fraud and graft) and the scheme itself was aimed at harming not only the Plaintiff, but the Debtor, other stakeholders (including the municipalities) the Trustee and this very Court.

249.    Cobra and its employees knew of the misrepresentations and omissions included in and executed a role in negotiating and otherwise facilitating the consummation of these transactions by failing to disclose any information pertaining to the fraudulent nature of the scheme, thereby facilitating the scheme itself.

250.    Cobra and its employees' participated in the core of the fraud. But for Cobra and its employees willingness and participation in the creation and concoction of scheme, the scheme simply could not have occurred.

251.    Cobra and its employees' nondisclosures and participation in fabricating the statements made a substantial contribution to the scheme's commencement and success as they were a substantial contribution in the sequence of responsible causation for the harm to Plaintiff and several others.

252.    As a result, Plaintiff suffered over $100,000,000 in damages.

253.    Accordingly, the Plaintiff is entitled to judgment against each of the Defendants in an amount to be determined at trial, plus interest.

## COUNT VI

## Abuse of Process

## (Against PREPA, Cobra)

254.    Plaintiff repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

255.    Defendants' conduct amounts to an abuse of process under Puerto Rico law because they maliciously misused the contract procurement process to accomplish a purpose not warranted.

256.    Specifically, Defendants acted in concert to funnel contracts in return for cash, personal favors and professional favors, and litigated this matter with an ulterior purpose in order to improperly use this litigation in an attempt to whitewash the trail of illicit funds, which attempts remain ongoing before this Court.

257.    As the Puerto Rico government entity overseeing PREPA in the bankruptcy has already indicated, Cobra's illegal conduct and/or violation of the PREPA contracts' provisions prohibiting conflicts of interest would render the contracts void altogether and "give PREPA a complete defense to further payments, a damages claim against Cobra, and/or the right to receive back payments made to Cobra under the vitiated contracts."  PREPA, under immense pressure from Cobra, chose to abandon this position, to the extreme detriment of Plaintiff as well as the estate.

258.    Defendant and Debtor PREPA, at the direction of or under the influene of at least Tribble, Ellison and Cobra, with knowledge that the law required PREPA to report and identify all relevant legal matters – including but limited to the abject fraud that PREPA knew of and allowed itself to participate in – during this proceeding.

259.    Instead, PREPA and Cobra, at the direction of or under the influence of Tribble, Ellison and Cobra, chose to continue facilitating illegal payments through the attempted settlement, which was not arms-length and could not possibly be legally arms-length for the numerous reasons stated herein.

260.    Defendants' fraudulent acts in this case were done intentionally and with the purpose and ulterior motive of ensuring that Cobra receives the monies it attempted to gain through the fraudulent scheme.   Defendants' continued filing of papers in this matter while intentionally omitting the real reason for the settlement, was an improper use of the process in the regular litigation of these proceedings.

261.    As a direct and proximate consequence of the conduct of Defendants, and each Defendant, Plaintiff has been injured in its business and property, causing Plaintiff to suffer monetary damages in an amount not less than $100,000,000, said damages to be proven at the time of trial.

262.    Defendants' conduct was in furtherance of their own private interests, and was willful, malicious, wanton, and oppressive, and done with conscious indifference to the consequences and with specific intent to harm. Accordingly, Plaintiff is entitled to an award of damages from Defendants, and each of them, in an amount to be proven at trial.

### COUNT VII

### Negligence

**(Against PREPA)**

263.    Plaintiff repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

264.    PREPA had a special relationship with Plaintiff.

265.    PREPA knew that Plaintiff was to be defrauded.  Alternatively, the Plaintiff was within a class of persons PREPA knew were to be defrauded.

266.    PREPA owed a duty of care to protect Plaintiff from being defrauded and victimized by the now factually-proven scheme.

267.    PREPA breached this duty by knowingly placing its preferred contractor (whether due to intimidation by FEMA regarding the withholding of funds, personal benefit or otherwise) in a position to commit fraud upon the Plaintiff while acting within the granted scope of authority.

268.    PREPA had the ability to control Cobra, and thwart its efforts to defraud the other stakeholders and, the government of the Commonwealth of Puerto Rico and the United States Government.

269.    PREPA further had the continuing ability to control Cobra disclosing to law enforcement, the public, Cobra, Mammoth, or the Plaintiff, knowledge of the fraud.

270.    PREPA had the continuing ability to control Petters and Petters Capital by correcting the Recommendation Letter.

271.    As a result of PREPA's breach of its duty, the Plaintiff suffered over $100,000,000 in damages.

272.    Accordingly, the Plaintiff is entitled to judgment against Defendant in an amount to be determined at trial, plus interest.

**COUNT VII**

**Negligent Misrepresentation**

**(Against PREPA)**

273.    Plaintiff repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

274.    PREPA intended that the its statements reach a class of persons,  *i.e.*, approved contractors of PREPA, of which the Plaintiff was indisputably a member.

185.    Given the content of the criminal sentencing documents, PREPA knew that its representations were  false, or should have known them to be false or PREPA was without knowledge of its truth or falsity.

186.    Given the discovery of the fraud, including recent revelations from Merritt and Sgroi, and slew of other evidence, PREPA knew that its representations were false, should have known that they were false or that PREPA was without knowledge of the truth or falsity of said representations.

187.    PREPA was negligent in issuing the work to Cobra alone.

188.    PREPA was negligent in not correcting this error.

189.    PREPA intended to induce reliance by recipients of its statements, which included Plaintiff, who justifiably relied upon the material to its detriment.

190.    As a result, the Plaintiff suffered over $100,000,000 in damages.

**COUNT VIII**

**Corporate Waste**

**(Against PREPA)**

195.    Plaintiff repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

196.     By engaging in the conduct described-above, including but not limited to, causing or permitting to pay excessive salaries and other inappropriate disbursements; and/or failing to halt the misuse of corporate funds to pay for personal or preferential expenses; incurring non-business non-compensable charges on the Debtor's corporate credit cards for various personal expenses; making unjustifiable payments to affiliated entities in which insiders had ownership interests; by engaging in self-interested transactions, including but not limited to self-interested transactions with affiliated entities, each of the Defendants caused the Debtor to divert the Debtor's assets for improper and unnecessary purposes for which no person of ordinary sound business judgment could conclude represented a fair exchange.

197.     Each of the Defendants is obligated to restore to the Debtor's estate the amount wasted through the foregoing wasteful and self-serving transactions.

198.     As a result, Plaintiff suffered over $100,000,000 in damages.

199.     Accordingly, Plaintiff is entitled to judgment against each of the Defendants in an amount to be determined at trial, plus interest.

## COUNT XI

**Avoidance of Fraudulent Transfers and Conveyances**

**(Against PREPA, Cobra)**

200.     Plaintiff repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

201.     The transfer of the Debtor's consideration pursuant to the proposed Settlement is a voluntary transfer.

202.     There was a creditor of the Debtor then in existence with an unsecured indebtedness owed it before such transfer was made and that creditor's debt remained unsatisfied on the date of

bankruptcy of the Debtor; and that creditor has filed a proof of claim against the Debtor's estate.

617.  The transfer of the funds pursuant to the proposed Settlement is voidable.

203.    Accordingly, the Plaintiff is entitled to void the transfer of the Debtor's Consideration pursuant to the proposed 2024 Settlement.

204.    As a result, Plaintiff suffered over $100,000,000 in damages.

## COUNT XII

## Unjust Enrichment

## (Against All Defendants)

205.    Plaintiff repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

206.    As described in detail above, Defendants benefitted by receiving property from the Debtor to which they were not entitled.

207.    As described in detail above, Defendants benefitted unjustly at the Debtor's expense.

208.    It is inequitable and unjust for Defendants to have received, been enriched by, and retained without payment of value, such benefits from the Debtor.

209.    Equity and good conscience require that Defendants disgorge monies and other assets obtained improperly from the Debtor.

210.    Accordingly, Plaintiff is entitled to judgment against Defendants in an amount to be determined at trial, plus interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court, with respect to Counts 1 through 209:

(a)  Enter judgment in favor of Plaintiff and award Plaintiff compensatory damages in an amount to be determined at trial;

(b)  To the extent applicable, award punitive damages in an amount to be determined at trial appropriate to the severity of conduct of the Defendants;

(c)  Award prejudgment interest to the extent allowed under applicable law or statute;

(d)  Award Plaintiff's reasonable attorney's fees and costs to the extent allowed under

applicable law or statute; and grant such further relief this Court deems just and proper.

Dated: September18, 2024                              Respectfully submitted,

                                                     By:  /s/ *Tyler A. Mamone*
                                                     Tyler A. Mamone, Esq.
                                                     Florida Bar No.: 111632
                                                     **MAMONE VILLALON**
                                                     100 SE 2nd St., Suite 2000
                                                     Miami, Florida, 33131
                                                     Tel: (786) 209-2379
                                                     Email: tyler@mvlawpllc.com

                                                     *PRO HAC Co-Counsel for Foreman Electric*

                                                     By:  /s/ *Wigberto Lugo Mender*
                                                     Wigberto Lugo Mender, Esq.
                                                     Supervising Attorney
                                                     **Lugo Mender Group, LLC**
                                                     100 Carr. 165, Suite 501
                                                     Guaynabo PR 00968-8052
                                                     Tel: (787)707-0404
                                                     Email: wlugo@lugomender.com

                                                     *Co-Counsel for Foreman Electric*